UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GAMMAGE,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN FRANCISCO, et al.,<br><br>Defendants. | Case No.  18-cv-05604-JCS<br><br>**ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO SEAL**<br><br>Re:  ECF Nos. 25 & 27 |

Plaintiff Michael Gammage brings this civil rights action under 42 U.S.C. § 1983 and state law claiming that he suffered constitutional violations committed by the City and County of San Francisco ("CCSF") and San Francisco Police Department ("SFPD") Officers Matthew Mroz and Daniel Espinoza (collectively, "Defendants") in connection with his traffic stop and arrest on October 1, 2017.  Defendants now move for summary judgment.  ECF No. 25.  Defendants also seek an order sealing videos of the traffic stop and arrest submitted in support of their motion for summary judgement.  ECF No. 27.  A hearing was scheduled for March 20, 2020 but was vacated in light of the COVID–19 emergency and General Order 72, *see* ECF No. 52.  The matter was taken under submission on the papers pursuant to Civil Local Rule 7–1(b).  For the reasons discussed below, the Court GRANTS Defendants' motion for summary judgment on Gammage's § 1983 claim and DISMISSES the remaining state claims without prejudice to refiling in state court.[1]  The Court DENIES Defendants' motion to seal.

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

**BACKGROUND**

**I.    Factual Background**

The claims in this case arise from an incident on October 1, 2017, during which SFPD officers physically removed Plaintiff Michael Gammage from his vehicle and arrested him during a routine traffic stop.  Body cameras worn by four SFPD officers captured audio and video of the traffic stop and arrest, and neither side disputes the accuracy or authenticity of these videos.[2] Consequently, the Court recounts the facts "in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 381 (2007).  The events immediately preceding the traffic stop were not captured on video.

**A.    Events Leading Up to the Traffic Stop**

Just after midnight on the morning of Sunday, October 1, 2017, Gammage, an African American in his early thirties, was driving in the Mission District of San Francisco while working for Uber.  ECF No. 37 at 7.[3]  Gammage had just dropped off an Uber passenger and was waiting for his next ride request as he drove his orange SUV northbound on Mission Street towards Onondaga Avenue.  ECF No. 26–3 (Gammage Depo.) at 87:5–22, 89:8–21.  That section of Mission Street runs north–south with two lanes of travel in each direction separated by a double yellow line.  *See id.* at 96:9–13; ECF No. 26–4 (Anton–Buzzard Depo.) at 28:6–18.

Meanwhile, SFPD Officers Matthew Mroz, Daniel Espinoza, and Alexander Anton–Buzzard were on duty in a marked patrol car on Mission Street.  ECF No. 26–1 (Mroz Depo.) at 56:25–57:9, 70:10–14; ECF No. 26–2 (Espinoza Depo.) at 22:3–6; ECF No. 26–4 (Anton–Buzzard Depo.) at 32:21–33:5.  Gammage spotted the SFPD patrol car as he approached a stop sign intersection on Mission near Italy Avenue, approximately two blocks from Onondaga.  ECF

---

[2] Both parties submitted video footage from the officers' body worn cameras ("BWC") in support of their respective summary judgment briefing.  Defendants filed Exhibits E, F, G, and H to the Declaration of Sheila S. Johnson (ECF No. 26) under seal via CD at ECF No. 28, and Gammage filed Exhibit D to the Declaration of Bradley D. Fell (ECF No. 36) via CD at ECF No. 38. Gammage's Exhibit D is a duplicate of Defendants' Exhibit E.  The Court cites to the video from each BWC as "[Officer's Last Name] BWC [Timestamp from Video in Coordinated Universal Time]."

[3] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF–generated page numbers at the top of the documents.

No. 26–3 (Gammage Depo.) at 91:5–12, 111:20–25.  Gammage claims that he observed three white male officers sitting in the patrol car parked next to the curb on the opposite side of Mission Street, facing south.  ECF No. 36 (Ex. A, Gammage Depo.) at 91:5–22, 102:11–17.  It was a "dark area" and Gammage saw the officers before they saw him.  *Id.* at 100:18–19, 102:9–12.  Gammage testified that as he drove by the patrol car, the officers made a U–turn through the lined median to follow him northbound on Mission.  ECF No. 26–3 (Gammage Depo.) at 91:13–22.  Gammage described the interaction as follows:

> I was driving, looking for people.  I pull up to a stop sign, I look around, and I see a cop car, and I see three officers sitting in one cop car, which I've never seen in my life, but sitting in one cop car.  And right there at that moment, that's when I felt, 'Oh, man.'  I just—I felt like, 'Oh, man, they're about to mess with me.'  Just off—it's late, it's dark, and my skin color.  That's it.  Sure enough, I go past the officers.  The only thing that's separating us is the median in the middle of the street.  I go past them.  As soon as I go past them, I'm looking in my rearview mirror, I could see them starting their car up.  I could see them hitting a U–turn.  So now I'm watching them in my passenger seat, but—I mean, in my rearview mirror.  And now I'm, like—I'm looking, and I'm, like—they're going, like, really fast.

*Id.* at 91:5–21.[4]

Mroz, who was driving the patrol car, denies making a U–turn and claims he was traveling northbound on Mission near Italy when he first noticed Gammage's SUV traveling in the same direction ahead of the patrol car.  ECF No. 26–1 (Mroz Depo.) at 70:10–14, 73:12–74:5; ECF No. 36 (Ex. B, Mroz Depo.) at 90:3–8.  Mroz began following the SUV from roughly 40–feet back and within the course of the next block, Mroz, Espinoza (passenger seat), and Anton–Buzzard (back seat) observed the SUV make two "abrupt" lane changes and then pull over and stop at the Onondaga intersection.  ECF No. 26–1 (Mroz Depo.) at 80:3–4, 109:24–110:5; ECF No. 36 (Ex.

---

[4] Gammage also testified that he made eye contact with "the first officer"—presumably Mroz—a "couple of minutes" before the traffic stop.  ECF No. 26–3 (Gammage Depo.) at 111:15–19.  It is unclear from the deposition excerpts in the record who "the first officer" is (or where the alleged eye contact occurred) but Gammage asserts in his opposition brief that when he "passed the patrol car, the officer on the driver's side of the vehicle made eye contact with him and then made and abrupt U–turn and pulled in behind him."  ECF No. 37 at 7.  Defendants' briefing does not address whether Mroz made eye contact with Gammage or could otherwise discern his race prior to the traffic stop.  Both Anton–Buzzard and Espinoza testified that they could not see Gammage until they approached his car during the traffic stop.  *See* ECF No. 36 (Ex. C, Espinoza Depo.) at 32:19–21; ECF No. 26–4 (Anton–Buzzard Depo.) at 53:6–25.

B, Mroz Depo.) at 90:6–8; ECF No. 26–2 (Espinoza Depo.) at 43:3; ECF No. 26–4 (Anton–Buzzard Depo.) at 48:8–23; ECF No. 36 (Ex. G, Anton–Buzzard Depo.) at 60:8–11.  Mroz testified that Gammage "abruptly swerved to the number one lane and then back into the number two lane" without using his turn signal and "within a very short period of time."  ECF No. 26–1 (Mroz Depo.) at 76:2, 109:13–15.  Espinoza and Anton–Buzzard testified that Gammage's lane changes were "very abrupt" and "erratic" but neither officer could remember at their deposition whether Gammage used his turn signal.  *See* ECF No. 36 (Ex. C, Espinoza Depo.) at 30:17–18, 42:22–24; ECF No. 26–4 (Anton–Buzzard Depo.) at 48:14–16; ECF No. 36 (Ex. G, Anton–Buzzard Depo.) at 60:8–11.

Gammage testified that he saw the patrol car "pulling up super fast" behind him and thought the officers "were going for somebody else" so he activated his turn signal, checked over his shoulder, and quickly moved from the inner–left lane to the outer–right lane to "get out the way."  ECF No. 36 (Ex. A, Gammage Depo.) at 108:2–110:8.  Gammage claims that "it was only [him and the officers] on the road" at that time.  *Id.* at 108:16.  When Gammage saw the patrol car immediately follow him into the right lane, he again activated his turn signal, checked over his shoulder, and made a second "quick" lane change, back into the inner–left lane.  *Id.* at 109:11–110:8.  The patrol car followed again.  *Id.* at 110:16–20.  At this point, suspecting that the officers were following him but not knowing why, Gammage decided to pull over on his "own initiative" to "find out what's going on."  ECF No. 26–3 (Gammage Depo.) at 112:23–113:7; ECF No. 36 (Ex. A, Gammage Depo.) at 111:4–10.  Gammage maneuvered to the far side of the outer–right lane and pulled over and stopped at the Onondaga intersection, "a little over a block" from where he first spotted the officers.  ECF No. 36 (Ex. A, Gammage Depo.) at 111:7–23.  The officers pulled up behind Gammage's SUV and activated their emergency lights to initiate a traffic stop for unsafe lane changes and failure to use a blinker in violation of the California Vehicle Code.  ECF No. 26–1 (Mroz Depo.) at 80:4–7, 109:16–19; ECF No. 26–2 (Espinoza Depo.) at 37:4–14.  Mroz also suspected that Gammage was driving under the influence of alcohol based on his abrupt

1   back–to–back lane changes.  ECF No. 26–1 (Mroz Depo.) at 83:12–19.[5]

2       **B.**    **The Traffic Stop**

3       Once stopped, Mroz got out of the patrol car and walked to the driver's side of Gammage's

4   SUV while Espinoza and Anton–Buzzard went to the passenger side.  *Id.* at 114:7–12; ECF No.

5   26–2 (Espinoza Depo.) at 40:20–23; ECF No. 36 (Ex. G, Anton–Buzzard Depo.) at 60:12–18.

6   Gammage rolled down his window and Mroz asked for his license and registration.  ECF No. 26–

7   3 (Gammage Depo.) at 92:17–21.  Gammage responded by asking why the officers were

8   following him and Mroz again requested his license and registration.  *Id.* at 92:20–22.  Gammage

9   ignored Mroz's requests and continued to ask why he was being followed.  *Id.* at 92:20–25.

10  Around this time, the officers activated their body cameras, which captured audio and video of the

11  remainder of the incident.  *See* ECF No. 26–5 (Ex. E, Mroz BWC video); ECF No. 26–6 (Ex. F,

12  Espinoza BWC video); ECF No. 26–7 (Ex. G, Anton–Buzzard BWC video); and ECF No. 26–8

13  (Ex. H, Marshall BWC video[6]).[7]  Gammage began raising his voice and arguing with the officers

---

[5] The officers did not conduct a field sobriety test or breath test and Gammage was not cited for driving under the influence.

[6] SFPD Officer Bary Marshall, one of the first backup officers to arrive on scene, activated his BWC approximately forty seconds after Mroz and recorded the incident from his vantage point behind Mroz, on the driver's side of the SUV.

[7] Defendants request leave to file the BWC videos under seal in their entirety.  ECF No. 27.  To overcome the "strong presumption of [public] access" to judicial records relating to a dispositive motion, Defendants must "articulate compelling reasons supported by specific factual findings" for why these materials should be sealed.  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006).  Defendants contend that the BWC videos—which are narrated in detail throughout Defendants' briefing—should be sealed because (1) they contain "sensitive" footage that may be used for improper purposes, (2) they depict police tactics and disclosure could compromise officer safety, (3) the public has "no genuine interest" in the videos, and (4) Mroz, Espinoza, and Gammage have "a compelling reason" to maintain confidentiality of the footage.  ECF No. 27 at 2–3.  These cursory justifications are unsupported by the facts.  Defendants do not identify how videos of an arrest made on a public street might be improperly used or offer any authority that supports sealing material merely because its contents are "sensitive" and particularly where, as here, the footage contains evidence that is highly probative to the case.  Moreover, these videos are of significance to the public, who has an interest in transparency of law enforcement activity and its use of force.  Finally, Gammage filed Mroz's BWC video on the public docket (*see* ECF No. 38) and he has not requested sealing of the other BWC videos to preserve his privacy.  Nor do Defendants raise privacy concerns regarding Mroz, Espinoza, or any other SFPD officer depicted in the BWC videos.  In sum, Defendants have failed to demonstrate a compelling reason for sealing that extends beyond "hypothesis or conjecture."  *Kamakana*, 447 F.3d at 1179.  Accordingly, Defendants' motion to seal is DENIED.

about why he was pulled over.  Espinoza BWC 7:13:36–7:14:05; Mroz BWC 7:13:44–7:14:05.

Espinoza, who was standing in front of Anton–Buzzard at the front passenger window, asked

Gammage to turn off the car and Gammage responded, "why am I shutting it off, why—what am I

getting pulled over for?"  Espinoza BWC 7:13:42–7:13:48; Mroz BWC 7:13:45–7:13:48.

Espinoza told Gammage he was pulled over for changing lanes multiple times without signaling

and Gammage began arguing with him, saying "no, no, it wasn't that, naw, naw, naw."  Espinoza

BWC 7:13:47–7:14:05.  Mroz again ordered Gammage to turn off the car and Gammage refused

again, saying "I'm trying to figure out why y'all are bothering me."  Mroz BWC 7:14:06–7:14:08.

Mroz repeated his instruction, "turn off the car," four more times over the next ten seconds.  *Id.* at

7:14:08–7:14:17.  Gammage ignored Mroz's commands and began calling his girlfriend, Brianna

Craven, on FaceTime using the iPhone mounted on his dashboard.  *Id.* at 7:14:10–7:14:15; ECF

No. 36 (Ex. A, Gammage Depo.) at 121:1–4.  Espinoza then ordered Gammage with a raised voice

to "shut the vehicle off, now," which led to the following exchange:

> Gammage:  What am I shutting it off for?
>
> Espinoza:  Because I'm telling you to shut if off for our safety.
>
> Gammage:  [raising his voice] No but why?  Why?
>
> Espinoza:  For our safety.  Shut the vehicle off.
>
> Gammage:  [now yelling]—this ain't—this ain't no safety, period—
>
> Mroz:  Yes it is safety!
>
> Gammage:  No it ain't no safety—
>
> Mroz:  —yes it is.
>
> Gammage:  [yelling louder] Look where I'm at … why are y'all bothering me?
>
> Mroz:  Because, I told you, the reason I pulled you over was for your unsafe lane changes.

Espinoza BWC 7:14:17–7:14:33; Mroz BWC 7:14:16–7:14:33.  Gammage then redirected his

attention to the FaceTime call, telling Craven "I need you to record everything that's going on . . .

I'm being detained for no reason … they're pulling me over for no reason."  Mroz BWC 7:14:34–

7:14:41.  Mroz informed Gammage that "everything is being recorded right now" and then asked

United States District Court<br>Northern District of California

6

him again for his license.  *Id.* at 7:14:36–7:14:38, 7:14:50–7:14:51.  The following exchange took place next:

> Gammage:  Dawg—dawg, what—why are you pulling me over?  We're in the middle—
>
> Mroz:  I told you why I'm pulling you over, already—
>
> Gammage:  —in the middle of a fucking intersection—
>
> Mroz:  —I've explained to you why I'm pulling you over—
>
> Gammage:  [yelling to Craven on FaceTime] I saw that they were going to pull me over … before they even pulled me over.
>
> Espinoza:  Hey (inaudible) this is going too far, alright?  Just simply—turn the car off …

*Id.* at 7:14:51–7:15:03; Espinoza BWC 7:14:51–7:15:03.  As Espinoza was ordering Gammage to turn off the car, Gammage locked the doors and started rolling up the front windows.  Mroz BWC 7:15:03–7:15:07; Espinoza BWC 7:15:03–7:15:07.  Mroz used his hand to hold the driver's window half–open and continued to order Gammage to shut off the car.  Mroz BWC 7:15:04–7:15:23.  The situation intensified when Espinoza exclaimed, "hey he's putting the car in drive!"  Espinoza BWC 7:15:19–7:15:20.  Anton–Buzzard, still standing behind Espinoza with his flashlight aimed inside Gammage's vehicle, immediately alerted Mroz that "the car's in drive."  Anton–Buzzard BWC 7:15:21–7:15:23.  At this point, Gammage was gesturing erratically towards Mroz and yelling, "I'm not feeling you on my window, I'm not feeling none of that cause (inaudible) about to break my shit … I'm not feeling none of that."  Mroz BWC 7:15:22–7:15:26.  Mroz responded, "all I'm asking you to do is shut off the car," and Gammage, who was becoming increasingly pugnacious and upset, began shouting, "Why?  Why?  I'm not doing none of that shit, dawg—I'm doing none of that—I'm not—I'm not."  *Id.* at 7:15:33–7:15:41.

### C.  Gammage's Arrest

At this point, Mroz, who was still holding Gammage's window ajar with his hand, instructed Gammage to get out of the car.  *Id.* at 7:15:43–7:15:44.  Gammage refused and began

rolling up his window on Mroz's hand. *Id.* at 7:15:44–7:15:46. Mroz tried to reach his left arm inside the window to unlock the door but Gammage swatted him away. *Id.* at 7:15:45–7:15:48. Then, Gammage briefly—for about four seconds—leaned forward, appearing to reach for something near his feet, as Espinoza remarked "what's he reaching for?" Espinoza BWC 7:15:50–54.[8]

Mroz warned Gammage, "listen man, I'm going to pull you out of the car … I'm going to pull you out of the car if you don't shut the car off." Mroz BWC 7:15:50–7:15:55. Gammage refused, saying "can you get off my shit dawg." *Id.* at 7:15:56–7:15:57. Roughly five seconds after his last warning, Mroz reached through the partially–open driver's window, unlocked Gammage's door, and attempted to pull it open. *Id.* at 7:16:00–7:16:06. Meanwhile, Espinoza circled behind the SUV, yelling "the car's in drive, the car's in drive" as he rounded the driver's side to assist Mroz. Espinoza BWC 7:16:06–7:16:12. Driver's door now open, Mroz told Gammage "get out of the car man," and Gammage refused, saying "uh uh." Mroz BWC 7:16:07–7:16:08. Mroz then reached into the SUV, shouting "get out of the car" and "put it in park" as he attempted to pry Gammage out. *Id.* at 7:16:08–7:16:12. Now joined by Espinoza, Mroz grabbed Gammage's lower leg and together the two officers pulled Gammage out of the car and onto the ground. Mroz BWC 7:16:10–7:16:16; Espinoza BWC 7:16:10–7:16:16; Anton–Buzzard BWC 7:16:10–7:16:16; Marshall BWC 7:16:10–7:16:16. At some point while this this was happening, Gammage's SUV—still in drive—rolled forward, moving approximately one to two feet before it stopped. ECF No. 26–1 (Mroz Depo.) at 124:8–19; *see* ECF No. 26–9 (still images from the Marshall BWC video).

Once on the pavement, a brief scuffle ensued as Mroz, Espinoza, and now Anton–Buzzard and a fourth officer, attempted to restrain Gammage and place him in a prone position to apply his handcuffs. Mroz BWC 7:16:14–7:16:21; Espinoza BWC 7:16:14–7:16:21; Anton–Buzzard 7:16:14–7:16:21; Marshall BWC 7:16:14–7:16:21. Over the next several seconds the officers

[8] As Gammage returned upright in his seat, he briefly appears to be holding a thin white rectangular object in his right hand. Espinoza BWC 7:15:54. Gammage testified that he was reaching for his second cell phone, which had fallen off his lap onto the floor of his car. ECF No. 26–3 (Gammage Depo.) at 88:12–22.

continued to yell "stop resisting," "put your arms behind your back" and "you're under arrest," as they attempted to grab Gammage's arms and pull them behind his back.  Mroz BWC 7:16:16–7:16:30; Espinoza BWC 7:16:16–7:16:30; Marshall BWC 7:16:16–7:16:30.  After multiple commands to "stop resisting," Gammage responded "I ain't resisting," and roughly fifteen seconds later an officer confirmed, "cuffs are on."  Mroz BWC 7:16:30–7:16:48.  Just as officers were securing his handcuffs, Gammage said "dawg, you're hurting my face, dawg … dawg, you're hurting my face."  *Id.* at 7:16:47–17:16:53.  According to Gammage, one of the officers held his knee on the back of Gammage's neck, causing his face to be pressed against the pavement while he was being handcuffed.  ECF No. 26–3 (Gammage Depo.) at 134:14–24.[9]  Within the next several seconds, the officers got off Gammage and then lifted him to his feet.  Mroz BWC 7:16:53–7:17:08.  In total, about fifty–five seconds elapsed between the time officers pulled Gammage from his car onto the ground to when they secured his handcuffed and helped him to his feet.  *Id.* at 7:16:10–17:05.  As the officers escorted Gammage to the back of the patrol car, he said something inaudible and "all you motherfuckers" and "do what you're gonna do … I don't give a fuck."  Mroz BWC 7:17:08–7:17:14; Marshall BWC 7:17:08–7:17:10.  The officers then patted Gammage down and secured him in the backseat of the patrol car.  Mroz BWC 7:17:14–7:19:05.  Gammage did not request or seek medical treatment at the scene or after the incident, *see* ECF No. 26–3 (Gammage Depo.) at 149:1–3, 163:8–10, and the BWC videos show no visible signs that he suffered any significant injury during his arrest.

Gammage was transported to a county jail where he was booked and charged with violating California Vehicle Code sections 21658(a) (unsafe lane change/failure to drive within a lane) and 2800.1(a) (evading an officer in a vehicle) and Penal Code sections 148(a)(1) (resisting, obstructing, or delaying of a peace officer), 243(b) (battery upon an officer), and 245(a)(4) (assault with force likely to commit great bodily injury).  ECF No. 36 (Ex. F, Booking Card) at 46–48.  All charges against Gammage were ultimately dismissed.  *See* ECF No. 26–12 (Government Claim

---

[9] Gammage does not identify which officer placed his knee on Gammage's neck and it is not immediately clear from the BWC videos based on the angles of the cameras.

Form) at 2.

## II.    Procedural Background

Gammage filed this action in September 2018, approximately one year after the incident, against CCSF and SFPD Officers Matthey Mroz, Daniel Espinoza, and Bary Marshall.  ECF No. 1.[10]  He alleges seven claims for relief:  (1) excessive force under 42 U.S.C. § 1983;[11] (2) violation of California Civil Code section 52.1 (the Bane Act); (3) assault and battery; (4) negligence; (5) false imprisonment; (6) intentional infliction of emotional distress; and (7) violation of California Penal Code section 13519.4 for racial profiling.  *Id.*

Defendants filed the underlying motion for summary judgment on December 17, 2019.  ECF No. 25.

## III.   The Parties' Summary Judgment Arguments

### A.    Defendants' Motion

Defendants seek summary judgment on all of Gammage's claims, making the following specific arguments.

*Section 1983 Excessive Force Claim (Mroz and Espinoza).*  Defendants contend that Mroz and Espinoza are entitled to summary judgment on Gammage's § 1983 excessive force claim because there is no genuine issue of fact as to whether their use of force to arrest Gammage was reasonable and appropriate.  Defendants assert that Gammage was agitated and erratic during the traffic stop and he refused to cooperate with routine commands despite multiple verbal requests and it was only after Gammage locked the doors and rolled up his window on Mroz's arm while his car was in "drive" that the officers resorted to using minimum force to remove him from his

---

[10] The parties stipulated to dismiss all claims against Officer Marshall with prejudice on August 19, 2019.  *See* ECF No. 22.

[11] Gammage's § 1983 claim, captioned "unconstitutional excessive force pursuant to 42 U.S.C. § 1983 by Michael Gammage against all Defendants," appears to be premised on two distinct theories of liability:  personal officer liability for Mroz's and Espinoza's alleged use of excessive force and municipal liability for CCSF's alleged unconstitutional practices and customs.  *See* ECF No. 1, ¶¶ 14–21.  Gammage brings his § 1983 municipal liability claim pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 (1978)—which is the only way that CCSF could be liable under § 1983 for a civil rights violation as a direct defendant.  Although Gammage's complaint alleges the § 1983 excessive force claim and *Monell* claim in a single count, the parties analyzed these claims separately.  So does the Court.

United States District Court
Northern District of California

car to arrest him.  ECF No. 25 at 20.  Defendants also assert that Barry Brodd, Gammage's expert on police practices and the use of force, reviewed the BWC videos of the incident and conceded at his deposition that the officers' use of force was reasonable:

> Q.  Got it.  So is it your opinion that if these officers had observed a traffic violation and that they had a reasonable suspicion to believe that a traffic violation had been committed, was the detention, arrest, and use of force, depicted in the [BWC] video footage you saw, reasonable?
>
> A.  Yes.

*Id.* at 19 (citing ECF No. 26–10 (Brodd Depo.) at 30:18–24).  Defendants note that the legal justification for Gammage's traffic stop does not come into play in the Fourth Amendment's excessive force analysis, which must be conducted separately from other alleged constitutional violations.  *Id.* (citing *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1547 (2017)).  Finally, Defendants argue that even if Mroz and Espinoza are not entitled to summary judgment on the excessive force claim, they are nevertheless entitled to qualified immunity because their conduct did not violate a clearly established constitutional right.  *Id.* at 22–23.

*Section 1983 Monell Claim (CCSF).*  Defendants contend that CCSF is entitled to summary judgment on Gammage's *Monell* claim because he cannot establish the requisite underlying constitutional violation (i.e., excessive force) and, even if he could, he has otherwise failed to provide evidence showing (1) that CCSF endorsed an unconstitutional policy or custom, failed to discipline its police officers, or ratified its officers' conduct and (2) that any such policy, failure to discipline, or act of ratification was causally connected to his alleged constitutional injury.  *Id.* at 23–26.

*Bane Act (California Civil Code section 52.1).*  Defendants argue that Gammage's Bane Act claim fails because Mroz and Espinoza did not violate his constitutional right to be free from excessive force and Gammage has not pointed to any evidence that either officer acted with a specific intent to violate his constitutional rights.  *Id.* at 26–27.  With respect to Gammage's allegation that he was denied his constitutional right to receive medical care while in police custody (*see* ECF No. 1, ¶ 24), Defendants assert that it is undisputed that Gammage did not request an ambulance following his arrest and argue that there is no evidence that he suffered

United States District Court
Northern District of California

11

anything other than superficial scrapes as a result of the incident. *Id.*

*Assault and Battery*. Defendants argue that Gammage's assault and battery claim fails as a matter of law because he cannot show that the officers' use of force was "unreasonable" as required under California law. *Id.* at 28.

*Negligence*. Defendants argue that they are entitled to summary judgment on Gammage's negligence claim for the same reasons they are entitled to judgment on his excessive force claim—namely, because the officers' use of force was objectively reasonable. *Id.* Defendants further assert that Mroz and Espinoza are protected from liability under California Penal Code section 835(a) (statutory privilege permitting officers who to use reasonable force to effectuate an arrest, prevent escape, or overcome resistance) and section 847(b) (immunizing officers from false–imprisonment liability if the officer had reasonable cause to believe the arrest was lawful). *Id.* at 28, 34.

*False Imprisonment*. Defendants contend that Gammage's false imprisonment claim fails as a matter of law because there was a lawful basis for both the traffic stop and arrest. *Id.* at 28–34. Defendants assert that the traffic stop was legal because (1) the officers had probable cause to believe that Gammage had violated California Vehicle Code section 21658(a) (unsafe lane change) based on his two abrupt lane changes within a one–block stretch[12] and (2) Mroz had reasonable suspicion that Gammage was driving under the influence based on his abrupt lane changes and manner of driving. *Id.* at 29–32. Regarding the legality of Gammage's arrest, Defendants argue that after he was lawfully pulled over, the officers developed probable cause to arrest him for violating section 2800.1 of the Vehicle Code (evading a peace officer) and multiple sections of the Penal Code, including section 148(a)(1) (resisting, delaying, or obstructing a peace officer scope of their duties) and sections 243(b), 243(c)(2), and 245(a)(4) (assault, battery, and battery on a police officer). *Id.* at 32–34. Finally, Defendants argue that Mroz and Espinoza are entitled to false–imprisonment immunity under Penal Code section 847(b) because a reasonable

---

[12] Defendants further argue that any dispute as to whether Gammage used his blinker is independent from the officers' probable cause to believe that Gammage's lane changes were "unsafe" in violation of section 21658(a). ECF No. 25 at 31.

United States District Court
Northern District of California

officer in their position would have believed Gammage's arrest was lawful.  *Id.* at 34.

    *Intentional Infliction of Emotional Distress*.  Defendants argue that Gammage cannot prevail on a claim for intentional infliction of emotional distress because their conduct was not "extreme and outrageous" as required for such a claim under California law.  *Id.* at 35–36.

    *Racial Profiling (California Penal Code section 13519.4)*.  Defendants seek summary judgment on Gammage's seventh claim on the basis that Penal Code section 13519.4 does not authorize a private cause action.  *Id.*  Defendants also argue that this claim should be dismissed because Gammage did not include allegations of racial profiling in his Government Claim Form.  *Id.* at 36–37.

    **B.    Gammage's Opposition**

    Gammage asserts that "this entire case rests with one ultimate factual question, did the [police] officers have the legal authority to conduct a traffic stop."  ECF No. 37 at 12.  According to Gammage, if the officers lacked legal authority (i.e., reasonable suspicion or probable cause) to initiate the traffic stop, then all subsequent conduct relating to his detention and arrest, including any use of force, "is fruit of the poisonous tree and must be viewed as illegal."  *Id.* at 12, 16.  Gammage contends that certain facts surrounding the basis for his traffic stop—namely, whether the officers made a U–turn to follow him and whether he used his blinker to change lanes—"are clearly material facts in dispute" and cannot be decided on summary judgment because these questions turn on the veracity and credibility of the witnesses.  *Id.* at 5, 7, 12–13.  Defendants' entire motion must be denied, argues Gammage, because it "rests on the assumption the police officers [sic] description of the events is true and therefore the subsequent detention and arrest were legal and reasonable."  *Id.* at 7.

    While the majority of Gammage's opposition arguments are tethered to his "fruit of the poisonous tree" theory, he also makes the following claim–specific arguments for why summary judgment should be denied.

    First, as to his *Monell* claim, Gammage asserts that CCSF has an unconstitutional practice and custom of racially profiling African American drivers who, according to Gammage's expert, are three time more likely than Caucasian drivers to be pulled over by SFPD officers.  *Id.* at 17–18

United States District Court
Northern District of California

(citing ECF No. 39 (Brodd Decl.) at ¶¶ 8–10).  Gammage and his expert rely on "The Stanford Open Policing Project," which purportedly "compiled information from over 200 million traffic stops across the country, including data provided by [the SFPD]."  *Id.*  Gammage asserts that this information shows "the systematic and pervasive racial bias against African–American drivers in San Francisco" and argues that CCSF "has either encouraged this racist behavior or purposely turned a blinds [sic] eye to its officers racially profiling drivers in San Francisco."  *Id.* at 18.

Next, Gammage asserts that his claims for false imprisonment and intentional infliction of emotional distress should survive summary judgment because "[i]f the jury determines the traffic stop was based on race and not on an actual traffic violation, then illegally arresting and jailing [Gammage] for nearly a week would clearly be an extreme and outrageous act supporting a claim for false imprisonment and intentional infliction of emotional distress."  *Id.* at 20.

Finally, Gammage rejects Defendants' assertion that summary judgement should be granted on his seventh cause of action for racial profiling, and argues that his government claim form includes sufficient information to put CCSF on notice of his racial profiling claim.  *Id.* at 21.

## C.    Defendants' Reply

Defendants reiterate in their reply that there is no dispute of material fact precluding a finding that Mroz and Espinoza used objectively reasonable force to arrest Gammage.  ECF No. 41 at 9.  Defendants argue that Gammage's "fruit of the poisonous tree" argument (i.e., if the traffic stop was unlawful, then any subsequent use of force was ipso facto unlawful) is contrary to the Supreme Court's mandate that the Fourth Amendment's objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional.  *Id.* (citing *Mendez*, 137 S. Ct. at 1547).  Defendants also argue that Gammage's failure address *Graham's* exclusive framework for analyzing excessive force claims is fatal to his § 1983 claim. *Id.* (citing *Graham v. Connor*, 490 U.S. 386 (1989)).  Relatedly, Defendants renew their contention that Mroz and Espinoza are entitled to qualified immunity because Gammage has not met his burden of demonstrating the constitutional rights at issue were "clearly established."  *Id.* at 10.

As to *Monell* liability, Defendants argue that Gammage has failed to establish a triable

United States District Court
Northern District of California

issue as to whether CCSF has a custom or practice of stopping African American drivers at a disproportionally higher rate than Caucasian drivers. *Id.* at 11. Defendants argue that Gammage's *Monell* arguments are based entirely on the Brodd Declaration,[13] which provides no factual context or other information regarding the SFPD traffic stops reported in "The Stanford Open Policing Project," such as when and where these stops occurred, the race of the officers involved, or whether these stops involved any unlawful conduct by SFPD officers. *Id.* Defendants further argue that summary judgment is warranted because "there is no evidence that [Gammage's] alleged constitutional violation was the result of the statistics presented." *Id.*

## EVIDENTIARY OBJECTIONS

In their reply, Defendants raise several objections to the evidence offered by Gammage in his opposition to Defendants' motion for summary judgment. *See* ECF No. 41 at 6–8. Because the challenged evidence is not pertinent to the Court's decision, it is unnecessary to rule on these evidentiary objections. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."); *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("Before ordering summary judgment in a case, a district court must . . . rule on evidentiary objections that are *material* to its ruling.") (emphasis added).

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non–moving party's claim, or to a defense on which the non–moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing

---

[13] Defendants also argue that the Brodd Declaration should be excluded because it contains opinions regarding CCSF's *Monell* liability and cites to "The Stanford Open Policing Project," neither of which were included in Brodd's Rule 26(a)(2)(B) expert report. *See* ECF No. 41 at 8. It is unnecessary to consider this argument because the Court did not rely on the Brodd Declaration.

summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.*
(citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely
disputed must support the assertion by . . . citing to particular parts of materials in the record
. . . ."). Only disputes over material facts—i.e., "facts that might affect the outcome of the suit
under the governing law"—will properly preclude the entry of summary judgment. *Anderson*, 477
U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* "[T]he
inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive
evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252. The non–
moving party has the burden of identifying, with reasonable particularity, the evidence that
precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is
not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.*; *see*
*Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in
a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable
to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.
2003). Neither conclusory, speculative testimony in affidavits, nor arguments in moving papers
are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co.,*
*Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all
reasonable factual inferences in favor of the non–movant, *Harris*, 550 U.S. at 378, but where a
rational trier of fact could not find for the non–moving party based on the record as a whole, there
is no "genuine issue for trial" and summary judgment is appropriate, *Matsushita Elec. Indus. Co.*
*v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Additionally, when, as here, there is videotape evidence of the incident in question, the
Court at summary judgment must view the facts "in the light depicted by the videotape." *Harris*,
550 U.S. at 381.

## ANALYSIS

### IV.    Section 1983 Liability

Gammage asserts his first (and only federal) cause of action for violation of his Fourth

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Amendment rights under § 1983 against (1) Mroz and Espinoza for their alleged use of excessive

2    force to arrest him and (2) CCSF pursuant to *Monell* for endorsing a policy or practice of using

3    excessive force.  Gammage has not challenged the lawfulness of his traffic stop or arrest under

4    § 1983; he instead asserts a state law claim for false imprisonment.

5         **A.    Excessive Force Claim Against Mroz and Espinoza**

6         Mroz and Espinoza move for summary judgment on Gammage's § 1983 excessive force

7    claim on the grounds that their use of force was minimal and objectively reasonable as a matter of

8    law.  In the alternative, the officers argue that they are entitled to qualified immunity.

9         Gammage argues that factual disputes regarding whether the officers had reasonable

10   suspicion or probable cause to conduct the underlying traffic stop preclude both summary

11   judgment on his excessive force claim and a finding of qualified immunity.  Notably, Gammage's

12   opposition does not mention, let alone address, the controlling framework for analyzing excessive

13   force claims set forth in *Graham v. Connor*, 490 U.S. 386 (1989).  *See Mendez*, 137 S. Ct. at 1546

14   (emphasizing that *Graham* sets forth the "settled and exclusive framework" for analyzing

15   excessive force claims and reiterating that "[i]f there is no excessive force claim under Graham,

16   there is no excessive force claim at all").  Instead, Gammage argues that his arrest was based on an

17   illegal traffic stop and therefore the officers' use of force to effectuate his arrest is "fruit of the

18   poisonous tree and must be viewed as illegal."  ECF No. 37 at 12.  That argument runs afoul of

19   Fourth Amendment jurisprudence on several fronts.  To start, the Fourth Amendment's

20   exclusionary rule (and its fruit of the poisonous tree doctrine) does not apply in the context of civil

21   suits under § 1983.  *See Lingo v. City of Salem*, 832 F.3d 953, 959–60 (9th Cir. 2016); *see also*

22   *Fowler v. California Highway Patrol*, No. 13–CV–01026–TEH, 2014 WL 1665046, at *10 (N.D.

23   Cal. Apr. 25, 2014) (holding that even if the underlying traffic stop was illegal for lack of

24   reasonable suspicion, the exclusionary rule would not render illegal the defendant–officer's arrest

25   of plaintiff for failing to comply with the officer's orders during the stop, because the exclusionary

26   rule does not apply to § 1983 suits).

27        More importantly, the Supreme Court has expressly instructed courts to not conflate the

28   analysis for excessive force claims with distinct Fourth Amendment claims, *see Mendez*, 137 S.

United States District Court
Northern District of California

Ct. at 1457, which is exactly what Gammage seeks to do by arguing that the officers' use of force (seizure #2) was unreasonable because the initial traffic stop (seizure #1) was unlawful.  That is wrong.  Instead, *Mendez* instructs that "the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional" and thus, "[t]o the extent that a plaintiff has other Fourth Amendment claims, they should be analyzed separately" from the excessive force claim.  *Id.*; *see also Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) ("Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice–versa.").  Thus, the lawfulness of the underlying traffic stop here does not predetermine the question of whether the degree of force used to arrest Gammage was excessive.  *See Sharp v. Cty. of Orange*, 871 F.3d 901, 916–17 (9th Cir. 2017).

### 1.      Reasonableness of the Use of Force

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable seizures."  *Graham*, 490 U.S. at 394; *see Mendez*, 137 S. Ct. at 1547 ("An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances.").  To determine whether the use of force is objectively reasonable, courts consider:  (1) "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted,'" (2) "the government's interest in the use of force," and (3) the "balance the gravity of the intrusion on the individual" and "the government's need for that intrusion."  *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citations omitted).

The reasonableness of the use of force is evaluated under an "objective" inquiry that pays "careful attention to the facts and circumstances of each particular case."  *Graham*, 490 U.S. at 396.  The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," without regard for the officer's subjective intent or motivation and without "the 20/20 vision of hindsight."  *Id.*  Thus, excessive force claims "are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."

1    *Mendez*, 137 S. Ct. at 1546–47 (citation omitted).  "That inquiry is dispositive:  When an officer

2    carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no

3    valid excessive force claim."  *Id.* at 1547.

4        "Force is excessive when it is greater than reasonable under the circumstances," *Santos v.*

5    *Gates*, 287 F.3d 846, 854 (9th Cir. 2002), and "the reasonableness of force used is ordinarily a

6    question of fact for the jury."  *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997).

7    "Because [the excessive force] inquiry is inherently fact specific, the determination whether the

8    force used to effect an arrest was reasonable under the Fourth Amendment should only be taken

9    from the jury in rare cases."  *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir.

10   2014) (internal quotation marks and citation omitted); *see also Chew v. Gates*, 27 F.3d 1432, 1443

11   (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a

12   matter of law.").  Nevertheless, defendant officers "can still win on summary judgment if the

13   district court concludes, after resolving all factual disputes in favor of the plaintiff, that the

14   officer's use of force was objectively reasonable under the circumstances."  *Liston*, 120 F.3d at

15   976 n.10 (citation omitted).

16                **a.      Type and Amount of Force Used**

17       First, courts assess the severity of the intrusion by evaluating "the type and amount of

18   force inflicted."  *Glenn*, 673 F.3d at 871.  Here, the SFPD officers' body cameras began recording

19   minutes before Gammage was pulled from his vehicle, so the entirety of the incident relevant to

20   Gammage's excessive force claim is captured on video.  The type of force employed here included

21   1) Mroz and Espinoza using their hands to pull Gammage out of his car and onto the pavement,

22   where they held him down in a prone position while attempting to secure his handcuffs with

23   assistance from Anton–Buzzard and another officer and 2) one of the officers placing his knee on

24   the back of Gammage's neck to restrain him, causing Gammage's face to be pinned against the

25   pavement while he was being handcuffed.  The force ended the moment the officers secured

26   Gammage's handcuffs, at which point they got off him, lifted him to his feet, and walked him to

27

28

United States District Court
Northern District of California

1   the back of the patrol car.  ECF No. 26–3 (Gammage Depo.) at 138:7–13.[14]  The entire incident

2   lasted approximately fifty–five seconds from the time Gammage was pulled out of his car onto the

3   ground to the time he was handcuffed and helped to his feet.  Mroz BWC 7:16:10–17:05.  The

4   officers did not threaten or use deadly force, they did not deliver any physical blows or cuts, and

5   no weapons were threatened or deployed.  *See* ECF No. 36 (Ex. A, Gammage Depo.) at 124:2–10

6   ("Q.  [Did officers threaten you with any weapons?]  A.  They didn't threaten me, no.  They didn't

7   threaten me with them, no.  Q.  Did you ever see the officers with any of those weapons while you

8   were speaking to them in your car?  A.  No.").

9        In evaluating the amount of force used, courts may consider the severity of injuries.

10  *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018).  Likewise, courts "may infer from the

11  minor nature of a plaintiff's injuries that the force applied was minimal."  *Id.* ("While injuries are

12  not a precondition to section 1983 liability, their absence can suggest a lesser degree of force when

13  that force is of the type likely to cause injuries.").  Here, Defendants assert that Gammage did not

14  suffer serious injuries from the officers' use of force.  ECF No. 25 at 18.  Gammage does not

15  dispute or deny this assertion and he has not presented evidence—medical or otherwise—that he

16  suffered greater than de minimis injury from Mroz's or Espinoza's (or any other SFPD officer's)

17  use of force.  It is also undisputed that Gammage did not request or receive medical attention at

18  the scene for any injuries, he did not ask to go to the hospital, and he did not seek medical

19  treatment following the incident.  *See* ECF No. 26–3 (Gammage Depo.) at 149:1–3, 163:8–10.

20       In his March 30, 2018 Government Claim Form, submitted six months after his arrest,

21  Gammage described his injuries as "[s]kin lacerations to the face, knees and back caused in the

22  course of the arrest."  ECF No. 26–12 (Government Claim Form) at 2.  During his deposition

23  nearly one year later, Gammage testified that his face was hurt by the officer who held his knee on

24

25  ───────────────

    [14] Gammage acknowledged at his deposition that the officers did not continue to exert force once

26  he was in handcuffs:
            Q.  After your hands were in handcuffs, did the officers get off of you?

27          A.  Yeah.
            Q.  Did any of them continue to hold you down when your hands were in handcuffs?

28          A.  They picked me up.  They picked me up, walked me over to the other -- to their car ….
    ECF No. 26–3 (Gammage Depo.) at 138:7–13

United States District Court
Northern District of California

Gammage's neck during the arrest and that his "physical injuries" caused him pain for "a few months" and prevented him from going on jogs.  *See* ECF No. 26–3 (Gammage Depo.) at 134:14–24, 163:3–18.[15]  Gammage has not, however, proffered any evidence of injury to support his vague testimony that he experienced pain for "a few months" or that he could no longer jog as a result of his unspecified physical injuries.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (finding plaintiff's "claim of injury is equally unsupported as she does not provide any medical records to support her claim that she suffered injury as a result of [the officers' use of force]").  Moreover, there is no indication from the BWC videos, which the Court has reviewed numerous times, that Gammage suffered any significant injury during his arrest.  Given the contemporaneous video footage and lack of evidence of injury in the record, the Court can, at most, infer minor injuries.  The Court concludes that the type and amount of force used was minimal.

### b.       Government's Interest in the Use of Force

Next, the government's interest in the force used is measured by assessing three primary factors:  (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  The *Graham* factors are not exclusive, rather, courts must "examine the totality of the circumstances and . . . whatever specific factors may be appropriate in a particular case."  *Glenn*, 673 F.3d at 872 (citation omitted).  Additional relevant factors may include "whether officers gave a warning before employing the force" and "whether there were less intrusive means of force" available.  *Id.* at 876.  In the Ninth Circuit, the "most important" *Graham* factor is "whether the suspect poses an immediate threat to the safety of the officers or others."  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (citing *Chew*, 27 F.3d at 1441).

Here, Gammage was initially stopped for minor traffic violations—crimes of low severity.

---

[15]  Gammage does not identify what "physical injuries" purportedly caused him months of pain and affected his ability to jog and he does not specify which officer(s) allegedly caused those injuries.

United States District Court
Northern District of California

1   *See Bryan v. MacPherson*, 630 F.3d 805, 828 (9th Cir. 2010) ("Traffic violations generally will

2   not support the use of a *significant* level of force.") (emphasis added); *but see Graham*, 490 U.S.

3   at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's

4   chambers, violates the Fourth Amendment.") (internal quotation marks and citation omitted).

5   However, the BWC videos show that Gammage was verbally combative from the outset of the

6   traffic stop and he became increasingly argumentative and uncooperative as the stop progressed.

7   *See Thompson v. Rahr*, 885 F.3d 582, 589 (9th Cir. 2018) (recognizing the "need for unquestioned

8   obedience to lawful commands during a car stop") (citation omitted).  Defendants argue that

9   Gammage's erratic behavior during the traffic stop—including his blatant refusal to obey simple

10  commands—created a reasonable belief that he posed an immediate threat to the safety of the

11  officers and public.  *See Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1096–97 (9th Cir.

12  2006) ("While the criminal conduct underlying [plaintiff's] arrest was not severe, he posed a threat

13  to . . . the police, and possibly to anyone who passed by him.").

14          Throughout the traffic stop, Gammage refused to comply with essentially every single one

15  of the officers' commands.  In the moments leading up to his arrest, he refused to turn off his car

16  or put it in park despite *dozens* of requests to do so and he instead argued with the officers about

17  why he was pulled over.  He then locked the car doors and began rolling up the windows and

18  continued to do so even after Mroz placed his hand on the driver's window to hold it open.  Then,

19  Gammage began reaching towards the floorboards of his vehicle.  The situation escalated further

20  when the officers realized that Gammage's car was in drive, which posed a particular danger to

21  Mroz, whose arm was partially inside the window.  Gammage ignored explicit orders to exit the

22  vehicle, including Mroz's final warning, "I'm going to pull you out of the car if you don't shut the

23  car off," and he resisted Mroz's efforts to unlock and open the driver's side door.  Mroz BWC

24  7:15:50–56.  Then, he Gammage resisted the officers' attempts to remove him from his car, while

25  it was still in drive.  Under these circumstances, a reasonable officer in Mroz's and Espinoza's

26  shoes would have concluded that there was an immediate threat to his safety and that of his fellow

27  officers and passersby.  Likewise, a reasonable officer on the scene would have believed that the

28  threat posed by Gammage was not contained until Gammage was out of the car and handcuffed.

United States District Court
Northern District of California

Defendants further argue that Mroz's and Espinoza's use of force to effectuate Gammage's arrest was no more than reasonably necessary given the circumstances. Viewing the facts "in the light depicted by the videotape," *Harris*, 550 U.S. at 381, the Court agrees. Mroz and Espinoza gave Gammage multiple opportunities to comply with their instructions before resorting to force, including Mroz's final warning to exit the vehicle voluntarily or be pulled out, and Gammage not only refused to cooperate, he actively resisted the officers. Notably, Gammage does not identify any less intrusive alternatives that the officers could have employed in response to the rapidly escalating situation. *See Glenn*, 673 F.3d at 876 ("Officers 'need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.'") (citation omitted).

### c.    Balancing the Interests

Finally, the Court balances the severity of the intrusion with the government's interest. Here, the force used was minimal, and the officers had a significant interest in protecting themselves and the public against foreseeable danger posed by Gammage's erratic and recalcitrant behavior. Mroz and Espinoza resorted to force only after express, audible warnings were ignored by an uncooperative individual who they reasonably believed posed a threat to officer safety and who was resisting officers and potentially seeking to flee in his vehicle. In sum, there is no triable issue: the force used was objectively reasonable under the circumstances.

### 2.    Mroz and Espinoza Are Entitled to Qualified Immunity

Even if the Court were to conclude a reasonable jury could find that the use of force here excessive, Mroz and Espinoza would nonetheless be entitled to qualified immunity. Individual officers are protected "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5–6 (2013) (per curiam) (citation omitted). The qualified immunity doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011). In determining whether an officer is entitled to qualified immunity, courts consider "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly

23

United States District Court
Northern District of California

established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Id.* (quoting *al–Kidd*, 563 U.S. at 742). Rather, in deciding whether a constitutional right was clearly established at the time of the alleged violation, the dispositive question is "whether the violative nature of *particular* conduct is clearly established" in light of the specific context of the case. *Id.* (emphasis in original). The plaintiff "bears the burden of showing that the rights allegedly violated were 'clearly established.'" *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted). "In other words, [qualified] immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citation omitted).

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks and citation omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (citing *Mullenix*, 136 S. Ct. at 309). In making this determination, courts consider the state of the law at the time of the alleged violation and the "information possessed by the officer to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007) (internal quotation marks and citation omitted). "The subjective beliefs of the actual officer are, of course, irrelevant." *Id.*

The question here then is whether, at the time of the incident in October 2017, the law was clearly established that officers could not use minor force under the circumstances after drawing all reasonable inferences in Gammage's favor.  The Court concludes that it was not.  Gammage has failed to meet his burden of "identify[ing] a case where an officer acting under similar circumstances as [Mroz and Espinoza] was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. at 552; *see also Sharp*, 871 F.3d at 911 ("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful.") (emphasis in original).  Nor has the Court located any authority that would have alerted Mroz and Espinoza that the degree of force they used to arrest Gammage, in the specific situation they confronted, was excessive under the Fourth Amendment.  To the contrary, the Ninth Circuit has found far more aggressive police conduct than Mroz's and Espinoza's to be objectively reasonable, even where the conduct resulted in serious physical injury.  *See, e.g.*, *Tatum*, 441 F.3d at 1097 (finding the officer's use of a control hold to force a suspect to the ground on his stomach was objectively reasonable under *Graham* where the suspect was behaving erratically and resisting arrest); *Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir. 2001) (applying *Graham* and concluding that spraying plaintiff's hair with a chemical irritant prior to her arrest, pushing her to the ground to handcuff her, roughly pulling her to her feet during her arrest, and forcing her to sit in the patrol car with the windows up in the July heat was not excessive force).  Accordingly, the Court finds that Mroz's and Espinoza's use of force under the circumstances did not violate clearly established law and they are therefore entitled to qualified immunity on Gammage's § 1983 claim.  Summary judgment will be granted in Mroz's and Espinoza's favor on Gammage's § 1983 claim.

### B.    *Monell* Claim Against CCSF

A local government entity may be held liable under § 1983 if "a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of [plaintiff's] constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694).  "Neither a municipality nor a supervisor, however, can be held liable under § 1983 where no injury or constitutional violation has occurred." *Jackson*, 268 F.3d at 653.  Where the record

1    reveals that the defendant officers did not violate the plaintiff's constitutional rights, "it follows as

2    a matter of course that [the plaintiff's] action against the City [defendant] fails." *Orin v. Barclay*,

3    272 F.3d 1207, 1217 (9th Cir. 2001) ("A § 1983 action against a city fails as a matter of law unless

4    a city employee's conduct violates one of the plaintiff's federal rights."); *see also Tatum*, 441 F.3d

5    at 1100 ("Absent a constitutional deprivation, neither [the officer defendants], nor the City and

6    County of San Francisco may be held liable under § 1983."). Here, Gammage has not

7    demonstrated a triable issue regarding the existence of an underlying constitutional violation.

8    Having concluded that Mroz's and Espinoza's use of force was objectively reasonable, CCSF may

9    not be held liable under § 1983. Therefore, CCSF is entitled to judgment as a matter of law on

10   Gammage's *Monell* claim.

11   **V.      State Law Claims**

12          Having granted summary judgment on Gammage's sole federal claim, the Court, in its

13   discretion, declines to assert supplemental jurisdiction over the remaining state law claims. A

14   district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over

15   which it has original jurisdiction. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir.

16   2010) (citing 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal–law claims are

17   eliminated before trial, the balance of factors to be considered under the pendent jurisdiction

18   doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to

19   exercise jurisdiction over the remaining state–law claims." *Id.* (citing *Carnegie–Mellon Univ. v.*

20   *Cohill*, 484 U.S. 343, 350 n.7 (1988)). Moreover, "state courts routinely handle assault, battery,

21   and negligence claims against police officers, and the similarity between the analyses for these

22   state law claims and federal claims does not mean that federal courts can or should exercise

23   jurisdiction over these matters." *Martinez v. City & Cty. of San Francisco*, No. C–13–04197

24   DMR, 2014 WL 7387809, at *3 (N.D. Cal. Dec. 29, 2014) (also noting that many courts in this

25   district have dismissed or remanded state tort claims against officers when the federal claims have

26   been resolved). Accordingly, Gammage's remaining state claims are DISMISSED without

27   prejudice to refiling in state court.

28

United States District Court
Northern District of California

**CONCLUSION**

For the reasons discussed above, the Court GRANTS Defendants' motion for summary judgment as to Gammage's § 1983 claim.  The Court declines to exercise supplemental jurisdiction over the remaining state claims and DISMISSES those claims without prejudice to refiling in state court.

The Court also DENIES Defendants' administrative motion to file under seal.  Within seven days of the date of this order, Defendants shall file public versions of ECF No. 26–5 (Mroz BWC video), ECF No. 26–6 (Espinoza BWC video), ECF No. 26–7 (Anton–Buzzard BWC video), ECF No. 26–8 (Marshall BWC video), and ECF No. 26–9 (still images from the Marshall BWC video).

The Clerk is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

Dated:  April 17, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge